IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINA
ROANOKE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
December 22, 2025
LAURA A. AUSTIN, CLERK
BY: /s/ Erica Jones
DEPUTY CLERK

TRACY MOLER, LINDA GOODRICH, MEGAN SEAY, individually and on behalf of all others similarly situated,

Plaintiff(s),

vs.

DELTA DENTAL OF VIRGINIA

Defendant(s).

Case No.: 7:25-CV-00937

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Tracy Moler, Linda Goodrich and Megan Seay ("Plaintiffs") bring this Consolidated Class Action Complaint against Defendant Delta Dental of Virginia ("Defendant" or "Delta" or "Delta Dental") as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to Plaintiffs' own actions and to counsel's investigation, and upon information and belief as to all other matters, as follows:

## I. CASE SUMMARY

1. Defendant is an insurance company that provides dental and vison insurance to individuals, families and businesses. It is part of a larger network of "Delta Dental" entities. According to its website, it offers access to the largest network of Dentists through Delta PPO and Delta Premier[1]. Plaintiffs and Class Members are current and former customers of Defendant. To obtain healthcare services and/or coverage from Defendant, patients, including Plaintiffs and Class members, were required to provide sensitive and confidential information to Defendant, including

[1] https://deltadentalva.com/

but not limited to their names, dates of birth, Social Security numbers, health insurance information, treatment information, medical record number, and medical history information.

2. This case arises from a cybersecurity incident that took place on Defendant's network that purportedly occurred between March 21, 2025, and April 23, 2025 (the "Data Breach" or the "Data Incident"). As a result of the Data Breach, Plaintiffs' private and sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised and unlawfully accessed by cybercriminals. The files accessed included the following information provided to Defendant in its provision of medical services: names, Social Security numbers, dates of birth, driver's license or state identification numbers, medical information, and other demographic information ("Private Information").

3. Plaintiffs Tracy Moler, Linda Goodrich and Megan Seay were customers of Defendant prior to the Data Breach and thus contend she is a victim of the Data Breach. Defendant issued a Breach Notice to victims on or about November 21, 2025. According to the notice posted on the corporate website, the Private Information potentially impacted could include the following: names; Social Security numbers; dates of birth; driver's license or state identification numbers; medical information; and other demographic information[2].

## II. PARTIES, JURISDICTION & VENUE

4. Plaintiff Tracy Moler is a resident citizen of Williamsburg, VA. Williamsburg is an independent city and not part of a traditional county[3].

5. Plaintiff Moler is a customer of Delta Dental of Virginia.

---

[2]https://deltadentalva.com/dam/jcr:6d716010-9511-47e4-a2e0-4c98f9bc1b15/1837%20LC%20Data%20Breach%20Notification_FINAL.pdf
[3]https://www.williamsburgva.gov/35/About

6. Plaintiff Linda Goodrich is a resident citizen of Richmond Virginia. Richmond is an independent city and not part of a traditional county.

7. Plaintiff Goodrich is a customer of Delta Dental of Virginia.

8. Plaintiff Megan Seay is a resident of Louisa Virginia. Louisa is in Louisa County.

9. Plaintiff Seay is a customer of Delta Dental of Virginia.

10. Defendant, the Delta Dental of Virginia, is a nonstock corporation that is listed as an insurance company with the Virginia Secretary of State with its principal place of business in Roanoke, Virginia which is located within Roanoke County, Virginia. Its listed Principal Place of Business is 5415 Airport Rd NW, Roanoke, VA, 24012, its Registered Agent for Service of Process is The Corporation Service Company located at 100 Shockoe Slip Fl 2, Richmond, VA, 23219 - 4100, USA.

11. Defendant provides Dental Health and Vision Insurance. They provide access to two different Dental Healthcare Networks and offer plans to individuals, small groups and large groups.

12. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.§1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from each Defendant.

13. This Court has personal jurisdiction over Defendants because Delta Dental's headquarters and principal place of business is in this District and both Defendant regularly conduct business in this District and have sufficient minimum contacts in this District.

14. Venue is proper under 28 U.S.C §1391(b) because the events and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## III. FACTUAL ALLEGATIONS

15. Delta Dental, in its broadest sense, refers to a national network of 39 independent "Delta Dental" insurance companies that provide dental insurance. Defendant Delta Dental of Virginia is one of those companies.

16. The Defendant provides and administers dental, and vision plans for individuals, families, small businesses, and large businesses. They have been administering benefits for 60 years and claim to offer the largest network of dentist in both Virginia and nationwide. They provide dental coverage in all 50 states and U.S. territories.

17. In order to become a customer of the Defendant, Plaintiffs and Class Members were required to provide sensitive and confidential PII, including their names, dates of birth, Social Security numbers, addresses, contact information, financial account information, health insurance information, and other sensitive information.

18. In its Privacy Practice, the Defendant acknowledges that they are required to maintain the privacy and security of the Plaintiff's Health Information[4].

19. In the same document, the Defendant advises that they have physical, electronic and process safeguards in place to protect this sensitive information[5].

20. Plaintiffs and Class Members provided their PII to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

---

[4] Ex. A: Privacy Practice

[5] Id.

21. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties.

22. Defendant had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

23. Defendant derived substantial economic benefit from collecting Plaintiffs' and Class Members' PII. Without the required submission of PII, Defendant could not perform the services they provided.

24. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

25. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and the Class Members from involuntary disclosure to third parties.

26. Despite recognizing its duty to do so, on information and belief, Defendant did not implement reasonable cybersecurity safeguards or policies to protect Plaintiff and the Class Members' PII.

**A. <u>The Data Breach</u>**

27. On November 21, 2025, the Defendant advised, in a letter posted on its website, that they discovered on or around April 23, 2025, a security incident involving one of its email accounts. An investigation that unauthorized access and acquisition of certain emails and attachments may have occurred between March 21, 2025, and April 23, 2025. The files contained

personal and protected health information (PHI), which may have included names, Social Security numbers, state or federal government-issued ID numbers, and PHI for affected individuals[6].

28. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' PII was a known risk to Defendants and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

29. The Data Breach was a direct result of Defendant's failure to implement an information security program designed to: (a) to ensure the security and confidentiality of customer information; (b) to protect against anticipated threats or hazards to the security or integrity of that information; and (c) to protect against unauthorized access to that information that could result in substantial harm or inconvenience to any customer.

30. An information security program encompasses the administrative, technical, or physical safeguards used to access, collect, distribute, process, protect, store, use, transmit, dispose of, or otherwise handle customer information. Had Defendant implemented an information security program consistent with industry standards and best practices, it could have prevented the Data Breach.

31. As a result of the Data Breach, Plaintiffs suffered an actual injury, similar to an intangible harm remedied at common law. Defendant's failure to implement an information security program resulted in the unauthorized disclosure of Plaintiffs' private information to cybercriminals. The unauthorized disclosure of Plaintiffs' PII constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendant's failure to adequately secure the PII in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiffs. The

[6] Ex B: Notice Letter

injuries Plaintiffs suffered, as described herein, can be redressed by a favorable decision in this matter.

32. Defendant has not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendant has modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

33. Defendant's conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation.

34. The imminent risk of future harm resulting from the Data Breach is traceable to the Defendant's failure to adequately secure the PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiffs.

35. More specifically, the Plaintiffs' exposure to the substantial risk of future exploitation caused him to: (i) lose time and effort spent responding to the Data Breach; and/or (ii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiffs suffered can be redressed by a favorable decision in this matter.

36. As a result of the Data Breach, Plaintiffs suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) statutory damages; (vi) nominal damages; and (vii) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under

Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data.

37. Plaintiffs bring this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendant's inadequate data protection practices and for failing to provide timely and adequate notice of the Data Breach.

**B. <u>The Data Breach Was Avoidable</u>**

38. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

39. Upon information and belief, the Data Breach was a direct result of Defendant's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to its published privacy practices; (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of personal information; and/or (iv) ensure its third-party vendors were required to implement reasonable data protection measures consistent with Defendant's data protection obligations.

40. Upon information and belief, the Data Breach occurred because Defendant's information repositories were improperly secured, which permitted an unauthorized party to access Plaintiffs' sensitive personal data.

41. To detect and prevent the Data Breach, Defendant could and should have implemented the following measures:

<u>Reasonable Safeguards</u>

a. Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer

network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

b. Periodically review accounts and privileges for critical and sensitive information repositories. Ensure that repositories such as cloud-hosted databases are not unintentionally exposed to the public and permit only necessary and authorized hosts to access them.

c. Implement multifactor authentication.

d. Implement data retention policies to automate periodically archiving and/or deleting data that is no longer needed.

e. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

f. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

g. Develop and publish policies that define acceptable information to be stored in repositories.

h. Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

i. Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

j. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

k. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

l. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

m. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

n. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

o. Configure firewalls to block access to known malicious IP addresses.

p. Set anti-virus and anti-malware programs to conduct regular scans automatically.

q. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

r. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

s. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

t. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

u. Execute operating system environments or specific programs in a virtualized environment.

v. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

w. Conduct an annual penetration test and vulnerability assessment.

x. Secure your backups.[7]

y. Identify the computers or servers where sensitive personal information is stored.

z. Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

aa. Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

bb. Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

cc. Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

dd. To detect network breaches when they occur, consider using an intrusion detection system.

ee. Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

ff. Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

gg. Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to

---

[7] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

hh. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[8]

42. Virginia's Insurance Data Security Act §38.2-623, requires covered financial institutions to develop, implement, and maintain an information security program with administrative, technical, and physical safeguards designed to protect against unauthorized access to nonpublic customer information. The primary requirements of an information security program are:

a. Designate a qualified individual to implement and supervise the information security program.

b. Conduct an assessment to determine foreseeable risks and threats – internal and external – to the security, confidentiality, and integrity of nonpublic customer information.

c. Design and implement its information security program to mitigate the risks identified through the risk assessment.

d. Place access controls on information systems, including controls to authenticate and permit access only to authorized persons to protect against the unauthorized acquisition of nonpublic information.

e. Regularly monitor and test the effectiveness of the chosen safeguards.

f. Provide staff with security awareness training and schedule regular refreshers.

g. Select service providers with the skills and experience to maintain appropriate safeguards. Include security expectations in vendor contracts, monitor the service provider's work, and provide for periodic reassessments of their suitability.

h. Stay informed regarding emerging threats or vulnerabilities and utilize reasonable security measures when sharing information relative to the character of the sharing and the type of information shared.

i. Ensure the information security program remains current. It should reflect changes to operations, changes based on information gained from risk assessments, changes due to emerging threats, changes in personnel, and

[8] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

changes necessitated by other circumstances that may have a material impact on the information security program.

j. Create a written incident response plan.

k. Require the qualified individual to report to the board of directors, in writing, regarding the overall status of the information security program, material matters related to the information security program, and recommendations for changes in the information security program.

43. Given that Defendant is an insurance institution that collected, used, and stored PII, Defendant could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

44. Without identifying the potential risks to the personal data in Defendant's possession, Defendant could not identify and implement the necessary measures to detect and prevent cyberattacks. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures, resulting in the Data Breach and the exposure of Plaintiffs and the Class Members' PII.

45. Defendant knew and understood unencrypted PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiff and the Class Members as a result.

### C. Plaintiff Moler's Experience

46. Plaintiff Moler provided Defendant Delta Dental with her sensitive PII as a condition of obtaining insurance. After Plaintiff provided her PII, Defendant suffered a Data Breach.

47. Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

48. Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

49. Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

50. Even with the best response, the harm caused to Plaintiff cannot be undone.

51. Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of his privacy.

52. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

53. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

**D. Plaintiff Goodrich's Experience**

54. Plaintiff Goodrich provided Defendant Delta Dental with her sensitive PII as a condition of obtaining insurance. After Plaintiff provided her PII, Defendant suffered a Data Breach.

55. Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

56. Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted his personal data to Defendant.

57. Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

58. Even with the best response, the harm caused to Plaintiff cannot be undone.

59. Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of his privacy.

60. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

61. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

**E. <u>Plaintiff Seay's Experience</u>**

62. Plaintiff Seay provided Defendant Delta Dental with her sensitive PII as a condition of obtaining insurance. After Plaintiff provided her PII, Defendant suffered a Data Breach.

63. Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

64. Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

65. Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

66. Even with the best response, the harm caused to Plaintiff cannot be undone.

67. Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

68. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

69. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

**F. <u>Plaintiff and Class Members Sustained Damages in the Data Breach</u>**

70. Plaintiffs would not have allowed Defendant to maintain their sensitive information if they knew Defendant would not implement reasonable safeguards to protect the data from unauthorized access and disclosure.

71. The invasion of the Plaintiffs and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendant's conduct. As a consequence of the Data Breach, Plaintiffs and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

72. Additionally, Plaintiffs and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their names, social security numbers, and dates of birth were targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to the Defendants' conduct.

73. Furthermore, Plaintiffs and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime, where their names and contact information were likely acquired in the Data Breach and potentially released on the dark web. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

74. Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[9] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

75. Given the type of targeted attack in this case, the sophistication of the criminal responsible for the Data Breach, the type of PII involved in the Data Breach, hacker behaviors in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed, or will be placed, on the dark web, it is reasonable for Plaintiffs and the Class Members to assume that their PII was obtained by, or released to, criminals intending to utilize the PII for future identity theft-related crimes or exploitation attempts.

76. The substantial risk of future identity theft, fraud, or other exploitation that Plaintiffs and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

77. For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that

---

[9] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[10]

78. As a consequence of the Data Breach, Plaintiffs and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

79. As a result of the Data Breach, Plaintiffs and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

80. Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[11] Data such as name, address, phone number, and credit history has

[10] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[11] *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers

been sold at prices ranging from $40 to $200 per record.[12] Sensitive PII can sell for as much as $363 per record.[13]

81. Furthermore, as a condition of obtaining insurance through the Defendant, Plaintiffs and Class Members were required to give their sensitive and confidential PII to Defendant.

82. Defendant retains and stores this information and derive a substantial economic benefit from the PII that it collects.

83. But for the collection of Plaintiffs' and Class Members' PII, Defendant would not be able to perform their services.

84. By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

85. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

86. However, Defendant failed to prevent this Data Breach by failing to properly secure and encrypt the files and file servers containing the PII of Plaintiff and Class Members.

87. Accordingly, through this Complaint, Plaintiff seeks redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

---

[12] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[13] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

## IV. CLASS ALLEGATIONS

88. Plaintiffs bring this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

89. The Class that Plaintiffs seek to represent is defined as follows:

**Nationwide Class:** All individuals residing in the United States whose PII was accessed and acquired by an unauthorized party as a result of a Data Breach (the "Class" or "Class Members").

90. Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

91. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

92. Numerosity: The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and such number is exclusively in the possession of Defendant. At this time, it is believed that this data breach impacted over 149,000 individuals[14].

[14] https://www.hipaajournal.com/delta-dental-virginia-data-breach-2025/

93. Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, includes the following:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

b. Whether Defendant had a duty not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

d. Whether Defendant required its third-party vendors to adequately safeguard the PII of Plaintiffs and Class Members;

e. When Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

i. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

j. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

94. Typicality: Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

95. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect

to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

96. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights, and the damages suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

97. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

98. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited

resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

99. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

100. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

101. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

102. Further, Defendant's actions apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

103. Likewise, the following issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, sharing, storing, and safeguarding their PII;

b. Whether Defendant's (or their vendors') security measures were reasonable in light of industry best practices;

c. Whether Defendant's (or their vendors') failure to institute adequate data protection measures amounted to negligence;

d. Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII;

e. Whether Defendant made false representations about their data privacy practices and commitment to the security and confidentiality of customer information; and

f. Whether adherence to FTC recommendations and best practices for protecting personal information would have reasonably prevented the Data Breach.

## V. CAUSES OF ACTION

### COUNT I: NEGLIGENCE/WANTONNESS

104. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

105. Defendant requires its customers to submit PII in the ordinary course of providing products or services.

106. Defendant gathered and stored the PII of Plaintiffs and Class Members as part of its business. Plaintiffs and Class Members entrusted Defendants with their PII with the understanding that Defendants would adequately safeguard their information.

107. Defendant had full knowledge of the types of PII it collected and the types of harm that Plaintiffs and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

108. By collecting, storing, sharing, and using the Plaintiffs' and Class Members' PII for commercial gain, Defendant assumed a duty to use reasonable means to safeguard the personal data it obtained.

109. Defendant has a duty to develop, implement, and maintain a written information security program designed to protect sensitive information. The information security program

must be appropriate to the size and complexity of the business, the nature and scope of business activities, and the sensitivity of the information at issue.

110. Defendant's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors to implement appropriate administrative, technical, and physical measures to protect and secure the information systems and nonpublic information that are accessible to, or held by, the vendor; (iii) complied with the Virginia Insurance Data Security Act ("VIDSA") and other applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of Defendant's and/or its vendors' data processing activities; (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach event.

111. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII that Defendant were no longer required to retain.

112. Defendant had a duty to notify Plaintiffs and the Class of the Data Breach promptly and adequately. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

113. Defendant violated its common law duty, the VIDSA, and other consumer protection statutes by failing to implement an information security plan or use reasonable security measures to protect PII. Defendant's violations constitute negligence and/or wantonness.

114. Defendant breached its duties, and thus was negligent/wanton, by failing to use reasonable measures to protect Plaintiffs and Class Members' PII. The specific acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to designate a qualified individual to implement and supervise its information security program.

b. Failing to conduct an assessment to determine foreseeable risks and threats – internal and external – to the confidentiality and integrity of information.

c. Failing to design and implement safeguards to control the risks identified through the risk assessment.

d. Failing to encrypt personally identifying information in transit and at rest.

e. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

f. Failing to adequately monitor the security of their networks and systems.

g. Allowing unauthorized access to PII.

h. Failing to detect in a timely manner that PII had been compromised.

i. Failing to remove former employees' PII it was no longer required to retain.

j. Failing to implement data security practices consistent with Defendants' published privacy policies.

115. The injuries resulting to Plaintiffs and the Class because of Defendant's failure to use adequate security measures was reasonably foreseeable.

116. Plaintiffs were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of updating, patching, or fixing critical vulnerabilities in its network.

117. Plaintiffs and the Class had no ability to protect the PII in Defendant's possession. Defendant was in the best position to protect against the harms suffered by Plaintiff and the Class as a result of the Data Breach.

118. But for Defendant's breach of duties owed to Plaintiffs and the Class, their PII would not have been compromised. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class.

119. As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

120. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

121. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

## COUNT II: BREACH OF IMPLIED CONTRACT

122. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

123. When Plaintiffs and Class Members provided their Private Information to Delta Dental as a condition of procuring insurance, they entered into implied contracts with Delta Dental under which Delta Dental agreed to reasonably protect such information by using reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

124. Plaintiffs and Class Members would not have entrusted their PII to the Defendant in the absence of an implied promise to implement reasonable data protection measures.

125. Defendants breached the implied contract with Plaintiffs and Class Members which arose from the course of conduct between the parties, as well as disclosures on the Defendant's web site, privacy policy, and in other documents, all of which created a reasonable expectation that the personal information Defendant collected would be adequately protected and that the Defendant would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

126. As a direct and proximate result of the Defendant's breach of an implied contract, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

127. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

## COUNT III: UNJUST ENRICHMENT

128. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

129. Plaintiffs bring this Count in the alternative to the breach of implied contract count above.

130. Plaintiffs and Class Members conferred a monetary benefit on Defendant. In creating an insured/insurer relationship with Delta Dental, they provided Defendant with their Private Information.

131. Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

132. Defendant enriched themselves by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security.

133. Defendant failed to secure Plaintiffs' and Class Members' Private Information and yet retains the full measure of premiums paid by the Plaintiffs and Class Members.

134. Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

135. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

136. Plaintiffs and Class Members have no adequate remedy at law.

137. As a direct and proximate result of the Defendants' conduct, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) actual identity theft; (ii) monetary damages; (iii) lost time attempting to mitigate the actual consequences of the Data Breach; (iv) lost benefit of the bargain; (v) statutory damages; (vi) nominal damages; (vii) emotional distress; and (viii) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PHI.

138. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

139. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## COUNT IV: INVASION OF PRIVACY

140. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

141. Plaintiffs and Class Members had a legitimate expectation of privacy in their personally identifying information such as their Social Security numbers, dates of birth, and credit scores. Plaintiffs and Class Members were entitled to the protection of this information from disclosure to unauthorized third parties.

142. Defendant owed a duty to Plaintiffs and Class Members to keep their PII confidential.

143. Defendant permitted the public disclosure of Plaintiffs and Class Members' PII to unauthorized third parties.

144. The PII that was disclosed without the proper authorization was highly sensitive, private, and confidential. The public disclosure of the type of PII at issue here would be highly offensive to a reasonable person of ordinary sensibilities.

145. Defendant permitted its information technology environment to remain vulnerable to foreseeable threats, which created an atmosphere for the Data Breach to occur. Despite knowledge of the substantial risk of harm created by these conditions, Defendant intentionally disregarded the risk, thus permitting the Data Breach to occur.

146. By permitting the unauthorized disclosure, Defendant acted with reckless disregard for the Plaintiffs and Class Members' privacy, and with knowledge that such disclosure would be highly offensive to a reasonable person. Furthermore, the disclosure of the PII at issue was not newsworthy or of any service to the public interest.

147. Defendant were aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized disclosure.

148. Defendant acted with such reckless disregard as to the safety of Plaintiffs and Class Members' PII to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiffs and Class Members.

149. Plaintiffs and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the other members of the Class

alleged herein, respectfully requests that the Court enter judgment as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff(s) as the representatives for the Class and counsel for Plaintiff(s) as Class Counsel;

B. For an order declaring the Defendant's conduct violates the statues and causes of action referenced herein;

C. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D. Ordering Defendant to pay for lifetime credit monitoring and dark web scanning services for Plaintiff and the Class;

E. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendants' conduct;

H. For injunctive relief as pleaded or as the Court may deem proper; and

I. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J. Such other relief as this Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

DATED: December 22, 2025.

Respectfully Submitted,

*/s/ Ramon Rodriguez, III*

Ramon Rodriguez, III (VA. Bar No. 48721)
**SIRI & GLIMSTAD, LLP.**
745 Fifth Avenue
Suite 500
New York, New York 10151
Telephone: (212) 532 1091
Email: rrodriguez@sirillp.com

-AND-

Paul J. Doolittle (*Pro Hac Vice* Forthcoming)
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com

*Attorneys for Plaintiffs and Proposed Class*